## GARRETT v. ILLINOIS CENT. R., CO.

(Circuit Court, W. D. Tennessee.    November 19, 1903.)

1. RAILROADS—INJURIES AT CROSSING—DIRECTION OF VERDICT.
   In the federal court, in an action for injuries to the driver of a wagon while crossing a railroad track, it is the duty of the trial judge to direct a verdict for the defendant, where under the evidence reasonable men could not differ as to whether plaintiff was guilty of contributory negligence; and this, although the court may doubt if the case should be taken from the jury.

2. SAME—USE OF TRACKS.
   Where the ground on which a railway crossing was constructed was a part of the railroad's right of way, and had never been dedicated or condemned as a street, but the railroad company permitted the public to cross at such point, and opened trains standing on the tracks for such purpose, the rights of the public to use the crossing were subordinate to the rights of the railroad company.

3. SAME—WHEN STOPPING REQUIRED.
   In an action for injuries to the driver of an express wagon while attempting to cross several railroad tracks in a city at a point where the right to cross existed merely by permission of the railroad company, evidence reviewed, and *held* to show that plaintiff was guilty of contributory negligence as a matter of law in failing to stop to see that all of the tracks were clear before attempting to cross.

4. SAME.
   Where defendant's servants, who saw plaintiff approaching defendant's railroad crossing, had no reason to think that he would attempt to cross until plaintiff had gotten on the tracks in front of an approaching train, and at that time such servants acted promptly and efficiently in slowing down, defendant was not liable, notwithstanding plaintiff's contributory negligence, on the ground that its servants, after they saw plaintiff, could have prevented his injuries by stopping the train before they did.

## On Motion to Direct a Verdict.

The plaintiff was injured by a collision with a train of cars at a crossing of the defendant company's tracks in the town of Fulton, Ky. He was in the employment of an express company, and driving an ordinary express wagon, when a slowly moving train of about four or five cars pushed against the wagon with such force as to upset the wagon and throw the plaintiff to the ground.

Long after the railroad company was constructed upon its. own right of way the town of Fulton crowded itself in close proximity to that right of way and the railroad tracks on both sides. So close was the town built up to the railroad that at several crossings within the corporate limits the streams of people going to and fro was almost constant. It was a disputed point in the proof of this case as to the number of people using this crossing during the period of one day, some of the witnesses putting it as high as 1,000 and others at less figures; but there can be no dispute that it was a busy crossing, being used even by school children in going to and from their schools, and everybody used it with the greatest freedom. The ownership of the property where the tracks were situated was that of the railroad company, and this way across its tracks was acquired alone by its acquiescence in the habit of the population to use it as a crossing. The owner of the property on one side of the road had subdivided his land and sold it in lots as the town grew, and made a street that came up to the point of this crossing on the railroad's right of way. There was never any dedication by the railroad, other than by its acquiescence, and never any condemnation or other appropriation of the locus in quo as a street. A convenient crossing was maintained, whether by the railroad company or the town does not appear, for the use of the public.

The crossing passed over five separate tracks of the railroad company, known in the proof as Nos. 1, 2, 3, 4, and 5, two switch or passing tracks being on either side of the main track. At one time this crossing and its adjacent territory had been used by the railroad company as a kind of switching yard, but recently before the accident they had constructed switching yards farther off, and very much reduced the uses of the tracks for that purpose, but they were still in almost hourly use for the purpose of passing trains and shifting cars for one purpose and another over this crossing. The railroad company was required, according to the testimony of one of the witnesses—whether by municipal ordinance or otherwise does not appear in the proof admitted at the trial—to open the way over this crossing whenever any cars were left standing on the tracks, and such was the habit of the company.

On this occasion track No. 1, nearest to the direction from which plaintiff was approaching, was occupied by standing cars, which had been cut at the crossing, leaving an opening the width of which is in dispute, some witnesses saying as much as 30 feet and others only 10. The next track, No. 2, was occupied by a long train of freight cars, with an engine attached, standing still, but, like the other, .cut at the crossing with an opening, again in dispute, but much narrower than the first crossing, and probably only 8 or 10 feet wide.

The plaintiff testifies that he approached the crossing some distance away, in a jog trot, but before he got to the track he slowed up and looked out in both directions, and listened to see if there were any moving or approaching trains. He did this several times, but testified that he did not stop before taking the crossing. He observed the standing cars on both the tracks and the standing engine, but heard no moving train or bell, or other indication of danger, and proceeded to cross. At that time there was moving towards the crossing, behind the standing train and standing cars on tracks Nos. 1 and 2, a switch engine, with four or five cars attached, the cars being pushed by the engine. The rate of speed was very slow, although there is a dispute about the number of miles per hour; but the physical fact that the express wagon was only pushed and overturned, and not more forcibly struck by the cars, shows conclusively that the movement of the train was a very slow one, and perhaps as noiseless as it was slow. There is a dispute as to whether the bell had been rung, or whether there was any outlook upon the front car of the moving train, and about the conduct of the train hands generally; but it is not necessary, in the view that the court took of the case, to detail these facts.

The railroad management generally took no precautions for protecting people at the crossing by sending a man ahead of the moving train to warn them off, nor by keeping any flagman there, and relied entirely upon the ordinary signals given by a moving train at a crossing. The train hands testified

that they blew the whistle for this crossing some distance back, according to their custom, and that the bell was ringing at the time continuously. They also testified that a man on top of the car shouted at the plaintiff, and tried to stop him, and that other warnings were given by bystanders, intended to stop him. None of these had any effect to check the plaintiff, and, driving on, he struck the main track without observing the approaching train until his wagon wheels were nearly on the main track. He then undertook to hasten his horse across by slapping him with the lines, and, seeing his danger, jumped out of the wagon, which was struck at the hind wheels, shoved off the track, and overturned by the moving train.

The habit of the people in using this crossing was to watch out for its dangers, and to wait until the moving trains had passed, often gathering in considerable numbers to await the clearance of the crossing from the trains. The plaintiff was familiar with the crossing and its dangers, and fully with the uses that the railroad company made of these tracks, his occupation with the express company bringing him in constant contact with these dangers. Although the railroad company was held to be negligent on the proof in at least not sending a man ahead of moving trains to clear the crossing of people passing, the court directed the jury to find a verdict for the defendant company upon the ground of the contributory negligence of the plaintiff.

T. N. Smith, Bullock & Timberlake, and S. W. Hawkins, for plaintiff.

Jno. E. Wells, for defendant.

HAMMOND, J. The motion of the defendant company to direct a verdict in its behalf because of the contributory negligence of the plaintiff is granted, and the verdict will be entered accordingly.

Technically this ends the case, so far as we are concerned, and the court might leave it so; but it would hardly be respectful to the jury not to explain the reasons for this action by the court, and certainly not satisfactory to the plaintiff and his learned counsel. Therefore I shall proceed to justify this judgment so far as it can be done by expressing the considerations that have influenced me to so dispose of this case.

The perplexities I have had with it have not arisen from any doubt in my own mind about the negligence of the plaintiff fatal to his right of recovery, nor about the negligence of the defendant company, equally obvious to my mind, both being grossly negligent on this occasion. But I have been perplexed to determine whether I should not submit the question of negligence on either side to the judgment of the jury and abide by the verdict. I should gladly do this, and relieve myself of the responsibility of decision; but the law does not permit it, even where the court is doubtful whether the case should be submitted to the jury. I have sometimes held this, and in favor of the right of trial by jury have submitted a case because I doubted if the court should take the case from the jury. But this is not the proper rule of judgment in our jurisdiction. If on the facts the negligence on either side be doubtful the case should go to the jury to decide that doubt, but the court must decide for itself the other doubt, whether or not there be in the facts any question of negligence to be decided by the jury. To explain, if the court here should submit a question of the defendant's negligence to the jury, when on the facts there was no question about it, that would be error; and it would be none the less an error, although a harmless one, if the jury should decide the

point correctly in favor of the negligence; nevertheless it was the duty of the court to decide whether there was any question to go to the jury. Similarly, if the court here should submit a question of the plaintiff's negligence to the jury when there is no question about it, that would be error, although the verdict should be that he was negligent. Swift v. Langbein (C. C. A.) 127 Fed. 111. It is not any want of trustfulness of the jury, nor any grave doubtings about the proper mode of disposing of it, but an entire absence of any doubtful inferences to be settled by the jury, that determines the practice that is proper to be taken by the court. It would be very easy for the court, and a very convenient evasion of its responsibility, as well as a very attractive one sometimes, to submit a question to the jury when there was no question, and if the jury decided in favor of the right let it stand on the verdict, but if they decided contrary to the right then grant a new trial, and to keep up this process until a jury was found that would decide according to the evidence; but this is not allowed in our jurisdiction, and the trial judge must, on his own responsibility, decide in the first instance, and preliminary to any submission to the jury, whether the facts present a question to be decided by the jury—must decide whether there be any doubt about the negligence or about the facts that are relied on to constitute it to be settled by a verdict. It is not an easy matter to decide this preliminary inquiry in any case, and yet it must be decided by the trial judge in every case where this motion is made before he submits any question to the jury. The case of Swift v. Langbein, supra, appearing since this opinion was written, quite statisfactorily presents a solution of this perplexing practice.

How does the trial judge decide it? Passing the ordinary technical grounds that the facts must be undisputed, etc., or of such preponderance that the judge should grant a new trial if the verdict were against the preponderance, etc., it may be explained in another way. It will have been observed from the cases read in argument and the discussions of them that the trial judge by such a motion as this is put on trial in the appellate court, and his guilt or innocence depends, when ground down in the crucible of logical results, on the somewhat speculative fact whether he shall be lucky enough to think the same way that the appellate judges may think on this precise question: whether or not reasonable men, passing on the conduct of the party involved, would pronounce it negligence or due care. If reasonable men would differ about it, the case must go to the jury; if not, the court must decide it. Hence it becomes, at last, with the trial judge, and with the appellate judges, as well, an inquiry as to whether there would be a difference among reasonable men about the alleged negligence.

There is not wanting high authority for the contention that the jury represents the whole body of reasonable men, and that it is the jury, and not the court, that should determine whether reasonable men would differ about it; that their verdict is the only conclusive and legal assurance that reasonable men would not differ on the subject of inquiry; and that it is a usurpation in the trial judges or the appellate judges, and a denial of the constitutional right of trial

by jury, for them to determine, in limine, that reasonable men would not differ on the inference of negligence in any case whatever. In other words, that the verdict of a jury is the only constitutional way of determining that identical question of what reasonable men would think about it. That is the rule in Tennessee.

But in our federal jurisdiction we have the other rule long established, that the trial judge is an essential part of that tribunal which we call a court and jury; that the jury trial mentioned in the constitutions comprehends the judge and his functions, as well as the 12 men and their functions; that it takes the two working together to conduct a jury trial; that our constitution preserves the functions of the one as well as the other; and that from time immemorial, long before the constitutions were established, the trial judge was required by law to direct a verdict from the 12 men when there could be reasonably no difference among them about the facts and the inferences to be drawn from them.

Acting on that rule, imperative on every federal judge, it seems to me that reasonable men would not differ about this case in its relation to the plaintiff's conduct on the occasion of his injury. It is not like the Ives Case, in 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, where the Supreme Court held that the trial judge acted properly in submitting the case to the jury; nor like the Farra Case, 66 Fed. 496, 13 C. C. A. 602, where the submission to the jury was approved; nor like the Grabow Case, 120 Fed. 258, where the plaintiff stopped to look and listen, and yet being injured it was a question for the jury as to his conduct in going on the crossing; nor is it like the Shatto Case (C. C. A.) 121 Fed. 678; nor are any two of the cases alike, in this class of cases, when carefully contrasted or compared, and each must always stand upon its own circumstances.

This case is more like the Jones Case, 95 Fed. 370, 37 C. C. A. 106, tried in this court, and affirmed on writ of error, where there was a judgment against this defendant company for negligence in running its trains and managing one of these crossings at Fulton, not more than a few hundred feet from this crossing. It has been an astonishment to me that after that experience, and a judgment affirming its negligence, it should be here again for almost an identical act of negligence, nearly at the same place. There the plaintiff was a young boy, and negligence could not in law be imputed to him, even where an adult could not recover at all.

In most of the cases, if not all, cited by counsel, there were physical and topographical obstructions to the faculties of sight and hearing that are not found in this case, either directly or by analogy. The great differential fact here is that the crossing lay wide out in the open, unobstructed at all, except temporarily by the handling of the cars in a way that was habitual and constant in the daily and almost hourly operations of the railroad service. This defendant was not using a street appropriated to its service, as ordinary street and highway crossings sometimes are appropriated. The inhabitants of Fulton have come there since the railroad was built and crowded their town upon the railroad right of way. The railroad has not gone into a town and acquired franchises to use a street, longitudinally or crosswise,

but the town has gone on and along the railroad property, and by its consent established crossings over the railroad, its switching grounds, or side and team tracks, as they are called in the proof, with full knowledge of the prior occupancy of the railroad, not of streets, but of the railroad's own land and its belongings. This peculiar condition implies, in my judgment, an obligation on the part of the population of Fulton that they will use these crossings without unreasonably interfering with their use by the railroad company; implies a recognition of prior use and prior right, if not of paramount use and paramount right; and imposes on the population a somewhat different degree of care in using the crossings than would obtain in the case of prior or paramount, or even exactly equal and joint, use of streets in a town where the railroad company had been' secondary and subsidiary in its acquisition of the use of streets. The learned counsel for the defendant company does not claim this, and is willing to put his case on the equal and exact level of ordinary joint occupation and co-equal 'privileges. But in determining the duty of people using this crossing, with full knowledge of the peculiar uses of the railroad service at all times, this fact should not be overlooked.

The railroad company has granted only a qualified privilege that the population may use the crossing when the company is not using its own property for its own service of cars and trains, and the population impliedly agrees to keep out of the way at such times as the crossing is needed in that service and in actual use, not because the company has a right of way on the street belonging to the public, but because the populace has only a right of going on the company's grounds when the crossing is not about to be used by moving cars. The distinction between the right of a person to cross a railroad track in a street over which the company has a qualified right of way and the public the free use, and to cross the company's own grounds on a way or street provided for the purpose at a place of which the public has only a qualified privilege and the company the free use, may be a nice one, but it is an obvious one at last. It finds an analogy in our state law, that holds that switching yards and switching tracks are not covered by statutory regulations for running trains over streets and highways, although the public uses them freely as thoroughfares and crossways. In the absence of statutory or municipal regulation governing such a condition as we find in this proof, the common law prescribes that of mutual or reciprocal care, each party to be governed by the relative right and duty arising out of ownership, joint right of possession or ownership, or such other foundation as will serve to fix the reciprocal right or duty, each case according to its circumstances.

It is as if the railroad company had inclosed its private grounds used for storing, parking, switching, and such like uses, with tracks adapted to such uses, and, for the benefit of the public, should take down the inclosure and allow the public to lay walks and crossings over its private grounds. Would not this impose a greater obligation to use care in the premises on the people so using the railroad property? I think so.

This plaintiff knew all about this crossing and its dangers. He was familiar with its uses by the railroad company. He was familiar with the methods used in handling the trains. His employment with the express company brought him in daily and hourly familiarity with all this. Possibly that familiarity made him careless, but, if so, it is not the fault of the railroad company.

With such full knowledge, as he came through Walnut street, the condition of the tracks, with its cars, precisely as we see it in the proof, was obvious to him. He knew it was most probable that trains and switching cuts of cars would be passing on these tracks hidden by the motionless cars. He knew that the standing cars were put in that position to allow other cars to pass alongside on the other and open tracks. He knew that the cuts of cars opened for the convenience of the public, on tracks 1 and 2, next to him, only indicated that that particular track was open for crossing, and was not an "invitation" to him to bottle himself up between them, if there should happen to be cars moving on the other three tracks beyond and alongside these two. He knew that such a condition was most likely to occur at any time owing to the peculiar and constant use of these tracks in switching day by day and hour by hour on these tracks. He knew that he should not enter those openings unless he had assurance that there were no moving cars on the other tracks; that he should not exaggerate this "invitation," as he now calls it, into a permission to cross, without doing all that a prudent person should do to see that it was safe to take the other tracks as well as those two. He knew that the want of customary signals of bell or whistle did not justify one in assuming that there were no trains coming, rushing, or creeping along those outlying cars that so absolutely obscured his ordinary vision and his ordinary hearing at such a dangerous crossing—dangerous above other and ordinary crossings, because it was put and had always been put to the dangerous use of switching, not once or occasionally, but continuously and constantly. If he did not know these things as here set forth, it is enough to say that an ordinarily prudent man with his opportunities of knowledge would have known them, and he is bound by that rule of conduct.

It is not always necessary to stop before taking a dangerous crossing; perhaps it is ordinarily not required that one should stop; but sometimes it is necessary, before either sight or hearing can be reasonably and prudently relied on to safely guard against the danger that is obvious and lies before one wishing to cross. It is just as necessary sometimes to stop in aid of sight as of hearing; one must use both reasonably, and taking this precise situation as known to one familiar with it by daily contact, and it seems to me that reasonable men cannot differ about the proposition that a full stop before going on these tracks should be made, until by inspection of sight and hearing the assurance is at hand that all the tracks are clear of approaching cars too close to make it safe to go on across the whole.

A reasonably prudent man would have stopped to look and listen before going over track No. 1 and between the cuts of cars. Such a stopping, looking, and listening, carefully and prudently, would have

shown these cars to this plaintiff both by sight and hearing. At such a crossing as this, hearing is not enough to safeguard a prudent man. The extraordinary dangers, and the fact that the railroad keeps there no flagman, uses no warning or signals, except the continual and unceasing ringing of a bell, which may become so familiar as to be almost useless as a warning, requires extraordinary care at this place; or, to put it more exactly, ordinary care in such a place, with such extraordinary dangers, is wanting unless one taking the crossing has stopped, before going thereon, if necessary, to see the dangerous tracks obscured by standing cars. The plaintiff did not stop to see, and therefore he cannot recover.

We are asked to instruct the jury that there was negligence to make the company liable after they had seen the plaintiff, and that, notwithstanding the plaintiff's negligence, the company's servants could have saved his injuries by stopping the train before they did stop it. There is not a particle of proof in this case to justify such an imputation of negligence. Those who saw the plaintiff had no reason to think he would attempt the crossing until he had got upon the tracks, and then they acted promptly and efficiently, or he would have been killed. He owes his life to their promptness and effective action.

There should be a verdict for the defendant, and it is ordered accordingly.